UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

TERESA SILVAS,

                Plaintiff,            Civil Action No.: 13-13912
                                            Honorable Robert H. Cleland
      v.                           Magistrate Judge David R. Grand

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [8, 12]**

Plaintiff Teresa Silvas brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [8, 12], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

**I.    RECOMMENDATION**

For the reasons set forth below, the Court finds the Administrative Law Judge's ("ALJ") decision, upheld in substance by the Appeals Council ("AC"), is not the product of any reversible error and is supported by substantial evidence of record. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [12] be GRANTED, Silvas's motion [8] be DENIED and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be AFFIRMED.

**II.    REPORT**

    **A.    Procedural History**

On July 10, 2010, Silvas filed an application for DIB, alleging disability as of September 1, 2006. (Tr. 118-119). Silvas had previously filed at least one other claim for DIB (and Supplemental Security Income) alleging the same onset date.[1] ALJ Thomas Walters denied Silvas's prior claim for benefits on April 13, 2010, a decision upheld by this Court in an opinion dated September 10, 2012. *Silvas v. Astrue*, No. 11-12510, 2012 U.S. Dist. LEXIS 128454 (E.D. Mich. Sept. 10, 2012).

Silvas's present claim was denied initially on September 13, 2010. (Tr. 71-74). Thereafter, Silvas filed a timely request for an administrative hearing, which was held on August 16, 2011, again before ALJ Walters. (Tr. 28-46). Silvas, represented by attorney Daniel Pollard, testified, as did vocational expert ("VE") Sharon Princer. (*Id.*). On August 16, 2011, the ALJ found Silvas not disabled since her alleged onset date, but did not address the existence, let alone the *res judicata* effect, of his prior decision. (Tr. 14-27).

On July 12, 2013, the AC reviewed the ALJ's decision and determined that the relevant time period for the ALJ's consideration was from April 14, 2010, through August 16, 2011, due to the *res judicata* effect of the prior ALJ decision. (Tr. 1-10). The AC further found that, for the relevant time period, the ALJ's decision denying Silvas's claim for benefits was supported by substantial evidence of record. (*Id.*). The AC decision became the final decision of the Commissioner and Silvas filed for judicial review of that decision on September 13, 2013. [1]. *See e.g., Hornbrook v. Astrue,* No. 09-40, 2010 WL 3168141, at *6 (W.D. Pa. July 23, 2010)

---

[1] In his decision, the ALJ mentions a prior application that was denied at the hearing level in 2007. (Tr. 19). There is no other reference to such an application or decision, either in the record before this Court, or in 2012 court order upholding the ALJ's 2010 decision. *Silvas v. Astrue*, No. 11-12510, 2012 U.S. Dist. LEXIS 128454 (E.D. Mich. Sept. 10, 2012).

2

("Where a request for review is granted and the Appeals Council proceeds to independently issue a decision denying a claimant's application for benefits, the decision of the Appeals Council constitutes the 'final decision' of the Commissioner and is *itself* subject to judicial review.") (emphasis in original); *Brewes v. Commr. of Soc. Sec. Admin.*, 682 F.3d 1157, 1162 (9th Cir. 2012) (ruling that "the Commissioner's decision is not final until the Appeals Council denies review or, if it accepts a case for review, issues its own findings on the merits) (citing 20 C.F.R. §§ 404.955, 404.981); *Phillips v. Colvin*, No. 13-110, 2014 U.S. Dist. LEXIS 35976, *3 (N.D. Ala. Mar. 18, 2014) (finding that Appeals Council decision that modified the ALJ's RFC, but still found claimant not disabled constitutes final decision of the Commissioner for purposes of review.[2]

### B. Framework for Disability Determinations

Under the Act, DIB is available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" in relevant part as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

---

[2] Neither party appears to realize that the ALJ's decision was modified by the Appeals Council, as both parties refer to the limitations imposed by the ALJ in his decision in their papers, and the Commissioner states that the ALJ's decision became final after the Appeals Council denied review, which is inaccurate. [12 at 2]. Because the Appeals Council's decision in this matter is actually the final decision of the Commissioner, the Court addresses Silvas's arguments as they pertain to the findings of that decision.

Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueuneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21 (E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

**C.     Background**

   *1.     Plaintiff's Testimony and Subjective Reports*

At the time of the ALJ's decision, Silvas was 51 years old. (Tr. 14; 130). She reported that the conditions preventing her from working are her shoulders, hands, diabetes, fibromyalgia, restless leg syndrome, rheumatoid arthritis and neuropathy. (Tr. 134). She alleged she stopped working in 2006 due to her conditions. (*Id.*). She testified that she has a rotator cuff impingement in her right shoulder and bicipital tendonitis in the forearms. (Tr. 35). She has arthritis in her right ankle, neck and bilateral shoulders, as well as a bulging disk in her lower

back. (Tr. 34-35). She also testified to numbness and aching in her hands. (Tr. 34). She testified that while she originally believed she had rheumatoid arthritis, it has since been diagnosed as polymyalgia rheumatica. (Tr. 36). Her pain level is usually about 4/10. (Tr. 37).

Silvas reported treating with numerous providers and had a scope to clean some arthritis out of her left shoulder the week prior to the hearing. (Tr. 34; 137-39). She also underwent left elbow surgery in May 2010. (Tr. 37). She reported taking a number of medications, including Ambien, Darvocet, and Neurontin for pain, methotrexate and vitamin D for rheumatoid arthritis, and Requip for restless leg syndrome. (Tr. 137). She reported that the Neurontin made her sleepy and impaired her driving and the Ambien also made her sleepy. (Tr. 149).

Silvas reported being limited to lifting no more than 25 pounds, and being unable to work above the shoulder level. (Tr. 142). She also reported that her legs and feet hurt when standing too long and that her right knee and back bother her when she walks. (*Id.*). Her neck hurts when sitting for too long and her rheumatoid arthritis flares up and affects her hands. (*Id.*). She also suffers from polymyalgia flare ups and leg swelling and pain. (*Id.*). She reported that her day consists of personal care, reading, watching television, some housework, shopping for groceries once or twice a week for 30 minutes to an hour, laundry if needed, attending church three times a week (for between 30 minutes and an hour at a time) and going to bed. (Tr. 143; 145-46). She has trouble sleeping due to pain and takes a nap during the day. (Tr. 40; 143). She has difficulty dressing, tying shoes, caring for her hair and shaving, due to pain from reaching overhead or reaching down, as well as difficulty using her hands. (Tr. 143). Her husband helps her dress, shower, and tie her shoes. (Tr. 38). She can prepare her own meals, but usually just eats protein shakes or microwave food that takes five minutes or less to prepare. (Tr. 144). She helps with some household chores including cleaning counters and dishes, and mowing the lawn if her

husband does not feel well. (*Id.*). She only goes out when she has to go somewhere, and can drive a car and go out alone. (Tr. 145). She enjoys reading, watching television and also talking on the phone once or twice a week. (Tr. 146). However, she can no longer hold a magazine for very long. (Tr. 40). Silvas reported that her conditions affect her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs and use her hands. (Tr. 147). She can walk 1½ blocks before needing to rest for a couple of minutes. (*Id.*). She can sit 45 minutes before needing to change positions and can stand for the same amount of time. (Tr. 39). She testified that the restrictions imposed by her doctor when she was at her prior job, which included no lifting above 20 pounds, no use of vibrating tools, limited forceful gripping and grasping, limited pushing and pulling and no work at or above the shoulder level, were still in place. (Tr. 35-36); *Silvas v. Astrue*, 2012 U.S. Dist. LEXIS 128486, *22 (E.D. Mich. July 31, 2012). In an appeals form, Silvas alleged that her conditions had worsened, but that this worsening occurred in 2006. (Tr. 150).

        2.    *Medical Evidence*

            a.    *Treating Sources*

                i.    *Left Ulnar Neuropathy*

At an appointment with her primary physician on January 26, 2010, Silvas complained about her left hand, noting the pain had become "much worse" over the prior three weeks. (Tr. 181-82). She was referred to Dr. Frederick Vincent, who evaluated her on February 17, 2010. (Tr. 176; 183). He noted that Silvas had recently undergone gastric bypass surgery and that while the nerve pain was not a direct result of that surgery, it could be a result of the substantial fat loss that had previously been protecting the nerve. (*Id.*). He noted that she had undergone no change in her physical activity and she was no longer diabetic since her surgery. (Tr. 177).

6

Upon exam, Silvas was noted to have a slightly weakened left hand grip compared to her right hand, although muscle bulk and strength were normal in both upper limbs. (*Id.*). A Tinel's sign was positive on the left. (*Id.*). After conducting an EMG, Dr. Vincent diagnosed Silvas with left ulnar neuropathy, and ruled out other types of neuropathy, radiculopathy or myopathy. (*Id.*). On February 22, 2010, Silvas's primary care physician referred her to Dr. Erich Hornbach, an orthopedic surgeon who had previously operated on her. (Tr. 183).

Dr. Hornbach evaluated Silvas on March 29, 2010. (Tr. 169). After reviewing Dr. Vincent's findings and conducting an examination, Dr. Hornbach diagnosed left ulnar neuropathy and scheduled Silvas for surgery. (Tr. 169-70). Silvas underwent surgery on April 20, 2010 and began physical therapy on April 29, 2010. (Tr. 160; 166; 171-74). At follow-up appointments with Dr. Hornbach in April and May 2010, Silvas was noted to have greatly improved and was released to return to normal activities. (Tr. 163-66). Silvas was discharged from physical therapy on June 16, 2010, with a finding that her left elbow and wrist were much better and stronger and her pain level was 0/10. (Tr. 158). Her grip strength had improved, she had been able to resume most activities, and was happy with the results. (*Id.*). On June 16, 2010, Silvas treated at Assessment-Rehabilitation Management, Inc., for orthopedic rehabilitation care after being referred there by Dr. Hornbach. (Tr. 158). A note from that visit indicates, "[Silvas] notes improvement in ring finger sensation…[Silvas] reports that her [left] elbow and wrist are feeling much better and stronger. She has resumed most previous activities…" (*Id.*). It also noted that Silvas was "happy with [the] result" of her surgery. (*Id.*). Silvas returned to Dr. Hornbach on July 22, 2010, where he found that her numbness was almost gone, she reported feeling great and happy. (Tr. 162). Dr. Hornbach advised he would see her on an as-needed basis. (*Id.*). However, Dr. Hornbach stated it would take two years to get a

7

final result. (Tr. 164).

> ii.   *Left Shoulder Impingement*

Silvas presented to her primary care physician on February 7, 2010, complaining of left shoulder and arm pain. (Tr. 296-97). She reported falling down stairs and landing on her elbow the August prior. (Tr. 296). She noted she could not sleep on her left side. (*Id.*). An exam found Silvas could only abduct her left shoulder to 30 degrees. (*Id.*). The doctor diagnosed a rotator cuff tear and ordered an MRI. (Tr. 297). An MRI of Silvas's left shoulder taken the following day revealed "mild tendonitis of the supraspinatus with no high grade partial or full thickness rotator cuff tear seen," "suspected ill defined tearing of the superior labrum at the biceps anchor and mild tendonitis of the adjacent long head biceps tendon," and "moderate acromioclavicular joint arthropathy." (Tr. 303-304).

On March 8, 2011, Silvas's left shoulder was evaluated by Amy Worthing, a physician assistant in a sports medicine clinic. (Tr. 278). Silvas reported having the pain since the prior fall, and sustaining a few falls, landing on her shoulder. (*Id.*). She denied numbness or tingling. (*Id.*). After conducting an exam and reviewing the MRI, Worthing diagnosed a left shoulder impingement with early degenerative changes. (Tr. 279). She gave Silvas an injection, referred her to physical therapy, and recommended the possibility of surgery. (*Id.*). The records show that Silvas was scheduled for a left shoulder scope, decompression, possible rotator cuff repair and possible distal clavicle excision on May 6, 2011. (Tr. 275). However, at a pre-op appointment, her surgery was rescheduled due to a flare up of her polymyalgia rheumatic. (Tr. 284).

> iii.   *Left elbow tendonopathy and radial tunnel syndrome, and trigger fingers*

Silvas presented to Dr. Hornbach on March 2, 2011, complaining of chronic lateral elbow

8

pain that was worse since her last visit. (Tr. 277). She reported trouble with gripping, grasping and pinching. (*Id.*). An exam revealed tenderness over the lateral epicondyle and pain with resisted long finger and wrist extension. (*Id.*). X-rays showed "calcifications off the lateral epcondyle consistent with chronic lateral elbow tendonopathy." (*Id.*). Dr. Hornbach also opined that Silvas may have radial tunnel syndrome. (*Id.*). He recommended blood injections, and if they did not work, neuropathic testing and potentially surgery. (*Id.*). On April 12, 2011, Silvas underwent a left elbow blood injection. (Tr. 282-83). At a follow-up on May 18, 2011, Silvas reported that her elbow pain was the same with no improvement. (Tr. 286). However, at a follow-up on June 15, 2011, she was able to engage in full flexion of the elbow and reported that, while her elbow was sore, it bothered her only "once in a while." (Tr. 288). Dr. Hornbach noted diffuse tenderness in the elbow, not localized over the lateral epicondyle. (*Id.*).

At the May 18, 2011 appointment, Silvas also reported triggering of her right ring and index fingers, and waking with stiff, puffy hands. (Tr. 286). Dr. Hornbach issued injections into Silvas's trigger fingers and recommended physical therapy. (*Id.*). At a follow-up on June 15, 2011, Silvas reported that the injections helped and that her fingers were "not bothering her at all." (*Id.*).

### iv. *Polymyalgia rheumatica and rheumatoid arthritis*

Silvas was treated by Dr. Niti Thakur, a rheumatologist, on March 4, 2010. (Tr. 268-69). She was diagnosed with polymyalgia rheumatica, but did not meet the criteria for rheumatoid arthritis. (Tr. 268). Other than a finding of restricted range of motion in Silvas's lumbar spine, her examination was within normal limits. (Tr. 269). The doctor managed Silvas's medications and recommended a follow-up in four months. (Tr. 268). At an April 7, 2010 appointment with her primary care physician, Silvas was noted to have stable rheumatoid arthritis symptoms. (Tr.

187-88). At a follow-up with Dr. Thakur on June 10, 2010, Silvas's symptoms were again found to be stable with no significant pain in her hips or shoulders. (Tr. 266). Silvas reported that the medication helped significantly. (*Id.*). An exam revealed normal results. (Tr. 267). An August 5, 2010 x-ray revealed osteopenia of Silvas's lumbar spine. (Tr. 196-97).

Silvas returned to Dr. Thakur on October 7, 2010, reporting that she was doing well. (Tr. 264). She reported increased symptoms after unilaterally stopping her medication, but that the symptoms decreased when she restarted it. (*Id.*). Dr. Thakur opined that some of Silvas's pain, particularly her neck and lower back pain, was likely due to degenerative joint disease rather than rheumatism. (*Id.*). An exam returned mostly normal results, though it again reflected a restricted range of motion in the lumbar spine. (Tr. 265). Dr. Thakur continued to recommend Darvocet for pain, as needed, and suggested that Silvas return in "three to four months" to follow-up. (Tr. 264). At an appointment with her family physician on November 9, 2010, Silvas reported feeling achy and lethargic, and generally not well. (Tr. 247). The doctor recommended reducing her medication to four a week as opposed to the six recommended by Dr. Thakur, and avoiding acetaminophen. (Tr. 248).

Silvas returned to Dr. Thakur on February 25, 2011. (Tr. 276). She reported wanting to lower her dose of medication. (*Id.*). She reported having stopped the medication completely two months prior with no ill effects. (*Id.*). She reported daily mild fatigue but denied other symptoms such as joint swelling, headaches, neck or jaw pain, scalp tenderness, chest pain or shortness of breath. (*Id.*). Upon exam, Dr. Thakur noted some scapular and trapezius tenderness but that the exam was otherwise unremarkable. (*Id.*). There was no joint swelling, temporal artery or proximal muscle tenderness, and Silvas's gait was normal. (*Id.*). Dr. Thakur opined that Silva's condition appeared to be in remission without the benefit of medication, although it

would take a few months for the medication to completely wear off. (*Id.*). However, at a pre-op appointment for her left shoulder on April 28, 2011, Silvas was noted to have multiple joint pain and stiffness. (Tr. 284). Her surgery was rescheduled as a result. (*Id.*).

On May 16, 2011, Silvas presented to her family physician complaining of, among other things, generalized aching. (Tr. 298). An exam revealed positive trigger points "generalized" and the doctor opined that it was "probably fibromyalgia." (*Id.*). At a May 18, 2011 appointment with Dr. Hornbach, Silvas also complained of lots of shoulder, hip, and knee pain. (Tr. 286). An exam revealed tenderness "everywhere." (*Id.*). Silvas returned to Dr. Thakur at the end of May 2011, who noted that her symptoms were stable, although she had chronic muscle pain that Dr. Thakur agreed was consistent with fibromyalgia. (Tr. 285). Silvas reported taking Savella which helped with her muscle pain. (*Id.*). She was also taking her medication again for polymyalgia rheumatica. (*Id.*). Dr. Thakur continued Silvas's medications and recommended a follow up in three to four months. (*Id.*).

> *v.* *Restless Leg Syndrome*

At an April 26, 2010 appointment with her primary care physician, Silvas was noted to have "well controlled" restless leg syndrome. (Tr. 189-90).

**D.  The ALJ's Decision**

Following the five step sequential analysis, the ALJ determined that Silvas was not disabled. (Tr. 17). At Step One, he found that Silvas had not engaged in substantial gainful activity since her alleged onset date. (Tr. 19). At Step Two, he found the following severe impairments: fibromyalgia, history of diabetes, history of carpal tunnel syndrome, status post left ulnar nerve transposition, status post left shoulder surgery, degenerative disc disease, knee arthritis, and polymyalgia rheumatic[a]. (*Id.*). At Step Three he concluded that none of Silvas's

severe impairments, either alone or in combination, met or medically equaled a listed impairment. (Tr. 20). Next the ALJ assessed Silvas's RFC, finding her capable of performing light work with the following restrictions:

> she can lift and carry 20 pounds occasionally and 10 pounds frequently; she can sit 6 hours in an 8-hour workday, and can stand and/or walk 6 hours in an 8-hour workday; she cannot perform overhead reaching; she cannot use air or vibrating tools; she cannot repetitively push, pull, grip or grasp; she can occasionally bend, twist, turn and climb.

(Tr. 21). At Step Four, the ALJ found that, based on this RFC, Silvas could not perform her past relevant work. (Tr. 22). However, at Step Five, the ALJ concluded that, based on the testimony of the VE, Silvas could still perform a number of jobs in the national economy based on her RFC, including information clerk (30,104 jobs in the regional economy), inspector (5,813 jobs) and usher (2,229 jobs).

### E. The Appeals Council's Decision

Upon review, the AC found that the ALJ erred as a matter of law in not acknowledging the *res judicata* effect of his April 13, 2010 decision. (Tr. 1-10). As to the relevant period, the AC adopted the ALJ's findings of fact, as well as his findings and conclusions as to whether Silvas was disabled. (Tr. 4). The AC found that the ALJ's decision for that period was supported by substantial evidence and did not suffer from any of the errors Silvas alleged on appeal. (Tr. 5). Based on the ALJ's factual findings and conclusion, adopted by the AC, Silvas was found not disabled. (Tr. 7).

### F. Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact

unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is

supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### G. Analysis

It is difficult to discern the specific arguments Silvas is making in support of her motion for summary judgment. Her brief, like so many others of her counsel, fails in almost every respect to go beyond mere quotations of black letter case law or recitations of facts that are almost exclusively limited to her subjective complaints. There is little effort to then synthesize the law with the facts of this case. Although the brief in the instant case was filed prior to Chief Judge Rosen's reprimand of Silvas's counsel in *Fielder v. Comm'r of Soc. Sec.*, it is worth noting that commentary here:

> …[T]his reliance on conclusory assertions and absence of developed argument has become the calling card of Plaintiff's counsel in a number of recent Social Security cases, and nearly every Magistrate Judge in this District has expressed this concern with the work product of Plaintiff's counsel….In light of this lamentable record of filing one-size-fits-all briefs and inviting the Judges of this District to formulate arguments and search the record on his clients' behalf, Plaintiff's counsel is strongly cautioned that this Court will carefully examine his submissions in future suits to ensure that they advance properly supported arguments that rest upon (and cite to) the facts of a particular case. Failure to adhere to these standards will result in the imposition of sanctions and possible referral of counsel for disciplinary proceedings.

*Fielder v. Comm'r of Soc. Sec.*, 2014 WL 1207865, at *1, n. 1 (E.D. Mich. Mar. 24, 2014) (internal citations omitted). As a further example of this "cookie-cutter" type briefing, Silvas attacks the wrong opinion altogether, as the controlling decision here is not that of the ALJ, but of the AC. *See supra*, fn. 2. The Commissioner similarly fails to acknowledge that the AC decision is the controlling one, and the one to which the parties should be directing their claims

and defenses. Nevertheless, for the sake of completeness, the Court will address each of Silvas's perfunctory arguments in turn.

### 1. *Credibility*

Silvas first argues that the ALJ erred in his assessment of her credibility. The Sixth Circuit has held that an ALJ is in the best position to observe a witness's demeanor and to make an appropriate evaluation as to her credibility. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). Thus an ALJ's credibility determination will not be disturbed "absent compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). When a complaint of pain is in issue, after the ALJ finds a medical condition that could reasonably be expected to produce the claimant's alleged symptoms, she must consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians . . . and any other relevant evidence in the case record." to determine if the claimant's claims regarding the level of her pain are credible. *Soc. Sec. Rul.* 96-7, 1996 SSR LEXIS 4 at *3, 1996 WL 374186 (July 2, 1996); *see also* 20 C.F.R. § 404.1529. Here, the ALJ's credibility determination, which was upheld by the AC, is supported by substantial evidence and should be upheld.

In support of her argument, Silvas cites to her own reports and testimony that she has pain in her neck and shoulders, polymyalgia rheumatic, fibromyalgia, bulging disc in the lower back, leg problems, right ankle, neck and shoulder arthritis, tingling in the fingers of her left hand, swelling in her legs and arms, stiffness and an inability to lift her arms over her head. She also cites to her testimony that she can only sit 15-20 minutes, stand for 45 minutes to 1 hour and walk a block and a half. She claims that the medical evidence supports these limitations. But her arguments are unavailing.

15

First, the medical evidence to which she cites is comprised mostly of mere diagnoses and treatments, not the imposition by doctors of certain functional limitations. [8 at 11 (noting that Silvas was diagnosed with, among other things, ulnar nerve compression L elbow, post-surgical transposition, bilateral open carpel tunnel releases and right thumb CMC arthritis)]. This evidence is unpersuasive as the "mere diagnosis of an impairment does not render an individual disabled nor does it reveal anything about the limitations, if any, it imposes upon an individual." *Welch v. Comm'r of Soc. Sec.*, 2014 WL 978201, at *7 (W.D. Mich. Mar. 12, 2014) (citing *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988), and *Foster v. Bowen*, 853 F.2d 488, 489 (6th Cir. 1988)). Second, Silvas relies on her own self-reports to doctors that her "main concern is arthralgias to multiple joints" and that "she has pain in her wrist and occasional swelling at small joints in her hands." *Id.* But the mere fact that the record contains these self-reports does not mean the ALJ/AC erred in assessing Silvas' credibility. The law is clear that even where there is "objective medical evidence of an underlying medical condition …an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones v. Comm'r. of Soc. Sec.*, 336 F.3d 469, 475-76 (6th Cir. 2003). Silvas omits her most important testimony, where she testified that her restrictions had remain unchanged since before she stopped working in 2006, restrictions that were considered and incorporated into the ALJ's 2010 decision, upheld on appeal, and included in the current RFC. (Tr. 21; 35-36); *Silvas*, 2012 U.S. Dist. LEXIS 128486 at *35-36 n.4.

Third, as the AC noted, the ALJ considered "several [] credibility factors in the decision. Specifically, he noted that there were no physician or other source opinions supportive of disability or greater limitations than those found in the decision; discussed the objective findings regarding [Silvas's] impairments; and also considered [Silvas's] response to treatment and lack

16

of medication side effects." (Tr. 5; *see also* Tr. 21-22). Silvas does not meaningfully challenge any of these specific findings, and the Court finds they are all supported by substantial evidence. The record does not reflect any physician-imposed restrictions greater than that found by the ALJ. And, as shown above, although there was some evidence that Silvas did suffer some impairments, that does not change the fact that substantial evidence (which is what this Court must review for, *see Cutlip*, 25 F.3d 286) supports the ALJ's conclusion that overall the medical evidence is at odds with the level of symptoms she claims. For instance, the ALJ correctly notes that no physician imposed the level of restrictions Silvas claims she needs, or which exceed the RFC imposed by the ALJ. (Tr. 21). The ALJ's finding that Silvas "responded quite well" to her surgical and more conservative treatment is also supported by substantial evidence. (Tr. 22; *see supra* at 6-10 (*e.g.*, ring finger had improved sensation, left elbow/wrist felt much better and stronger, and Silvas had resumed most previous activities as of June 2010 (Tr. 158); rheumatoid arthritis symptoms stable with no significant pain in her hips or shoulders as of June 2010 (Tr. 266); full flexion of her elbow which bothered her only "once in a while" as of June 2011 (Tr. 288); fingers "not bothering her at all" as of May 2011 (Tr. 286); ceased taking medication in later 2010 or early 2011 with no ill effects (Tr. 276)).

Finally, the ALJ appropriately noted that Silvas's activities, including preparing simple meals, washing dishes, doing light laundry, driving a car, playing with her grandchildren and shopping (she is also able to mow the lawn), (Tr. 22, 144), are inconsistent with the level of disabling impairments claimed by her.

In short, the Court finds that the ALJ's credibility determination as adopted by the AC, is supported by substantial evidence of record, including Silvas' own testimony, and that she has offered no compelling reason to disturb it.

17

### 2. *Treating Physician Rule*

Although Silvas does not specifically argue that the ALJ/AC failed to comply with the treating physician rule in this case, she spends multiple pages in her brief laying out the black letter law that would apply to such an argument. (Tr. 12-14). However, there is actually no treating physician opinion in the record, and thus this rule is inapplicable. Further, as noted above, Silvas testified that the restrictions placed on her prior to 2006 were still in force. (Tr. 35-36). Therefore, neither the ALJ nor the AC erred, but in fact, both gave appropriate weight to, the prior restrictions and incorporated them into the decision.

### 3. *Adequacy of Hypothetical (Attack on RFC)*

Finally, Silvas argues that the ALJ/AC erred in posing a hypothetical to the VE that did not accurately reflect all of her limitations. She argues again here that the hypothetical should have included a number of additional limitations, including that her pain in her shoulders and back was "constantly a 4/10" and increased "with any level of activity," that she "suffers from tingling in her left hand and some numbness in her hands bilaterally," that her medications make her drowsy, that she naps daily and that her most comfortable position is lying down. [8 at 12]. But these are all subjective reports of limitations and side effects, and the Court has already explained why the ALJ's credibility determination rejecting these reports is supported by substantial evidence.

While an ALJ may only rely upon the testimony of a VE in response to hypothetical questions to the extent those questions accurately portray the claimant's physical and mental impairments, *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987), she is only required to include in those questions limitations that she finds credible. *Burbo v. Comm'r of Soc. Sec.*, No. 10-2016, 2011 U.S. App. LEXIS 26143 (6th Cir. Sept. 21, 2011) *citing*

18

*Stanly v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 118-19 (6th Cir. 1994). Here, both the ALJ and the AC noted that Silvas's claims of medication side effects, a need to nap daily, and a need to constantly recline were not credible limitations as they were not supported by the medical evidence of record. (Tr. 6; 21). The ALJ also noted that no physician had imposed restrictions more preclusive than those of the RFC, that Silvas had responded well to surgical and conservative treatments, and that her activities of daily living belied her claims of completely disabling pain. (Tr. 22). For the same reasons the Court finds that the ALJ properly assessed Silvas's credibility, *see supra* at 16-17, the ALJ's RFC assessment and corresponding hypothetical to the VE were proper in that they included only those limitations that were supported by substantial evidence of record. Thus, the Court finds no error here.

### III. CONCLUSION

For the foregoing reasons, the Court **RECOMMEND**S that Silvas's Motion for Summary Judgment **[8]** be **DENIED**, the Commissioner's Motion **[12]** be **GRANTED** and this case be **AFFIRMED**.

Dated: July 23, 2014  s/David R. Grand
Ann Arbor, Michigan  DAVID R. GRAND
  United States Magistrate Judge

### NOTICE TO THE PARTIES REGARDING OBJECTIONS

Either party to this action may object to and seek review of this Report and Recommendation, but must act within fourteen days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991)*; United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing objections which raise some issues but fail to raise others with specificity will not

preserve all objections that party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). A copy of any objection must be served upon this Magistrate Judge. E.D. Mich. LR 72.1(d)(2).

Each **objection must be labeled** as "Objection #1," "Objection #2," etc., and **must specify** precisely the provision of this Report and Recommendation to which it pertains. Not later than fourteen days after service of objections, **the non-objecting party must file a response** to the objections, specifically addressing each issue raised in the objections in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc. The response must be **concise and proportionate in length and complexity to the objections**, but there is otherwise no page limitation.

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 23, 2014.

                         s/Eddrey O. Butts
                         EDDREY O. BUTTS
                         Case Manager